318-0687, the Oak Run Property Owners Association, at the lead by John Robertson and Ray Vassa et al., at the lead by Alyssa Nelson and the Spring Valley Lake Sanitary District, at the lead by James Blake, v. Michael Zagardo and Janice Zagardo, appellants by Jim Skinner. Mr. Skinner. I'm Jim Skinner. I'm the attorney for Michael and Janice Zagardo in this case. I'm going to start out by stating what I think is clearly agreed to. There's four things I think that are key to this case that the Court found that I think at least my client and most of the other clients agreed to. One, the Court found that the bosses did not comply with the AEC rules in attempting to obtain a permit to build this wall, which is the subject of this litigation. The Court found that the bosses deceived, whether intentionally or accidentally, the AEC committee and Mr. Russell, who is the inspector. The Court found also that the wall exceeded the scope of the extensive landscaping permit that was submitted originally. Do you disagree it was within that August permit date? No, I don't think so. Okay. He said it exceeded but didn't say whether it was originally included. Right. I think he said it exceeded. I mean, I don't know if you've seen that exhibit. It says on that exhibit, there's like a line or something that says wall. I don't know if it says wall to be explained later or something like that. And number four? Number four is the Court found that the wall was actually a building because it was attached to the house. I filed my brief based on three, I think, interrelated points, and I'm going to try to explain why I think they're interrelated. Number one was the issue of completion. The Court, in citing the Black's Law Dictionary definition and then reciting to the facts in the record, found the wall was complete. We do believe that was an abuse of discretion, and that's why this is an abuse of discretion appeal on that issue. I do believe the Court, this Court, has before it almost exactly the same things that the trial court had before. I mean, there's a picture that they rely on. There's an invoice of Mr. Courtright who built the wall. And I think when you look at those things primarily and consider the state that it was in when this issue arose, that it was not complete by any definition, be it the definitions I've cited from my brief, be it Black's Law Dictionary, be it the case I cited to which was applying to the New Jersey wall, admittedly, I don't believe this wall was complete in any way. What is the date of reference for your argument? Well, nobody knew in the trial court at that time. Nobody knew the exact date. And the testimony was pretty consistent that it was in late October at some point. But nobody knew the exact date. Nobody had it. There was no document anybody could point to.  What about the date the complaint was filed? The date the complaint was filed was, I believe, December 3rd. Do you agree it was completed by that date in time? It probably was. I don't know that there was. I would suspect that it probably was. I don't know that there was any photo or anything taken on that date, but it probably was. So why is it relevant, whether it was completed on the 5th of October or whatever? 25th-ish. 25th. Yeah. I think it's relevant, and that's kind of how I was going to argue about how these things are interrelated. It's relevant because it goes to the boss' state of mind when this problem was discovered as far as whether or not they should be given the benefit of the weighing of the equities. Because they knew somewhere in late October there was a problem. At that point, I think they're on notice that there's a problem with this. And it's important to point out what they didn't do. They didn't go try to get a permit at that point. They just completed it. They just went ahead and finished it. Well, what does Article 6 of your covenants that binds everybody in this homeowners association, what does that say? Well, it says, if I can cite it, I have it right here. Is there ambiguity in that language? I think there is. Okay. To me, and I can answer that question. I anticipated that would be asked. And this is another part of my brief and how it's interrelated. I don't think that it is intended to apply to a situation where nobody even attempted to get the benefit. The question is, what does it say, not what you think. I mean, I can read it. Well, okay. I'm just asking, what's wrong with that language now? Well, the first thing, the first way I'm answering your question is I don't believe that it was intended to apply to a situation where nobody even attempts to get a permit. I mean, there wasn't even an attempt in this case. I mean, the trial court pretty much found, not pretty much, expressly found that it was not permitted, that they didn't file a permit that included this. Well, it says in any event. Yeah, it does say in any event. And I understand that. I do. It does say in any event. It's not. It's completed. But I don't think that that should be interpreted to apply to a situation where somebody, without any attempt to get a permit, builds something and sneaks it past the committee or the inspectors or whoever at that time. I don't think it should apply to that. I believe that there is some vagary to this. I believe the any event means if they failed to act on your permit as opposed to any other. To me, it doesn't make a lot of sense that it would be. There's no circumstances under which if 30 days goes by, you can't do anything about it because it makes these rules almost superfluous. They mean almost nothing. I mean, you can just evade these rules by being sneaky. And I'm not casting a spell on the bosses by saying that, but by being sneaky or just deliberately doing something in the middle of the winter when nobody's around and nobody's going to notice. I don't think that should be the intent. And I'm not ascribing to the bosses that they were being sneaky like that, but I'm just saying that kind of situation. That was going to be my question. How do you sneakily, if that's a word, erect a retaining wall? I mean, it's really clear and obvious when it's under construction. Well, yes, to some degree. But Oak Grove's got thousands of lots, and you don't know the terrain out there. It's very hilly and rolling. That's kind of the issue in this case. They built this big wall to shore up the yard. It isn't, I don't think, as obvious as you might think that there would be things like this that could go on without people seeing, especially when it's in October or it's in November. It's a seasonal place. A lot of people live out there part-time. There's obviously not a ton of construction going on that time, so I don't think that it's as unlikely as you might believe that somebody could, in this area where there's lots of trees and hills and ravines, build something in that time of the year and people not notice it. But the people that we're concerned with are the next-door neighbors. Right. And if they had cameras on their property or if they stopped by occasionally, wouldn't they have noticed this retaining wall going up? Well, there's two points I would make on that. It is not their primary residence. So Janice testified in her testimony about where they had been. I believe she said they were in New Mexico. But I'm just saying, they weren't there until a day or two before she took that picture, which is Exhibit E. So she hadn't been there. I don't know what the next neighbor is down, so I can't talk to that. All I know is about my client. Isn't that kind of the reason behind the covenant, though? It says maybe if you don't notice it and it's substantially completed, then you've got to be silent. Yeah. I don't believe that's how it should be read, but I understand your interpretation of it that way. So, really, I think turning to my next point concerns the injective relief. And, you know, there's been cases cited by both parties. I'm not going to beat up those cases. There's cases on both points of that issue. I think Ms. Roberts was found new in that you just decided maybe a month ago or something. We believe this falls more in line with the intentional violation cases. And just to be clear, I know there's been some criticisms. The cases I cited admittedly are trespass cases more than they are easement cases, but that Ari Lola versus Nigro case says expressly therein that the same law applies to easements. And it's citing to Gursley versus, I can't read my writing. I think it's Glob, but it's in the case. It's cited in the case. We believe that when you go backwards and look at the history of what happened, the filing of a permit with landscaping that clearly did not show this wall, the failure to act at any point once you knew there was a problem shows intention or willful negligence of the bosses in not attempting to get a permit. And we believe that that activity or actions or their knowledge constitutes an intentional act, and it precludes the weighing of the equities in this case because of their acts. There's little doubt that the covenants weren't followed and that they never even tried to follow them after they came to their intention. The last argument relates to the application of the AEC rule, and I think I've kind of covered this a little bit in response to your questions, and I don't really want to go over that again, but an interpretation of completion as it applies to what happened in this case. And I don't believe that as the AEC rules were written, I do believe there is some vagueness to what any event means, and I don't believe it was intended, that language was intended to apply to a situation where they didn't even try to get a permit. And we know they didn't try to get a permit in this case, and the court found that. And so for those reasons, we believe that the decision of the trial court should be overturned. Do you have any questions? May I ask you a question? Yes. Excuse me. Sorry.  There was a protectable interest here. I didn't see in your brief where you argued whether there were or were not adequate remedies at law. Well. So let's assume we agree there's a protectable interest. Aren't there other considerations before injunctive relief should be? There can be. I mean, there is. And in some of those cases, I tried to address the issue where you don't have to weigh the equities, and that was those intentional cases where you don't have to weigh the equities. There's also some cases I cited, too, from Chicago about building permits where they deceived the city in obtaining a building permit and built buildings, like buildings that had to be destroyed at hundreds of thousands of dollars of cost. So I don't know that you have to get to that adequate remedy law if you find it was intentional and there was you don't have to weigh the equities anymore. That I don't know. Let me understand your argument, then. You want us to accept the trial court's finding that there was some malfeasance here, intentional or not, accidental. There was a deliberate noncompliance. And because of that, injunctive relief to remove the structure is automatic. Based on that finding, is that your argument? Yes, or at least in accordance with cases I cited to talk about that issue. All right. I appreciate that. Thank you. Thank you, Mr. Schneider. Mr. Robinson, you're up first. Thank you, Your Honors. May it please the court, counsel. Counsel alluded to a recent case of this court, JCR Holdings. I've got copies for the court. I suspect you have your own copies. The case is 2019 LAP 180677. That case was decided August 30th, long after the briefs were filed in this case, and I found it in preparing for oral argument. I've given a copy to counsel. The one thing in Mr. Skinner's argument that I want to reply to directly is this. In evidence is Zagardo Exhibit 8. It's a photograph which Mrs. Zagardo took on the day she first saw the offending wall. That's also the first date that it was called to the attention of Oak Run. It's also the date that Judge Mangieri made his finding that the wall was complete. The wall was built in less than a week, top to bottom. When we talk about completion, that's the date we're talking about. That's the earliest possible date that Oak Run would have seen this. If you recall from the briefing in light of Oak Run's rules about when they can seek injunctive relief, if it's completed, we can't do anything. I've lost that case, to be candid. We're living with it now and doing the best we can. Rather than try and go parse everything, I just want to say things. The appeal in this case is built on five specific false premises. The first false premise is the claim that the Zagardos had a protectable property right in the easement on their neighbor's property. The easement exists in favor of the utilities and the property it serves. They don't have a protectable property interest in someone else's easement. In addition to the extent that they've argued that- Let me understand the facts. Wasn't the easement on the Bastas' property, but it was in favor of the utilities? It's in favor of the utilities. But whose property was it on? It was on the Bastas' property. It's not on the Zagardos' property. The second thing is they made an argument in the trial court that their aesthetic view was somehow obscured by this, but that's not actionable in Illinois and we cited a case. The second legal premise that's false is that they're entitled to injunctive relief regardless of the cost of what the remedy would be. In the trial court, we cited existing Illinois law, which is again cited by this court in its recent decision, which says that you have to balance the equities. And Judge Mangieri balanced the equities and found that the cost of remediation, somewhere between $100,000 and $157,000, outweighed the damage to the Bastas' property. Third false legal premise is that the Zagardos say they have no duty to mitigate their damages. Appraisers testified that the damage to their value of their property was $10,000 with the wall there, but it would be totally mitigated with landscaping. Mrs. Zagardo testified that they didn't think they had to mitigate their damages, they were going to mitigate their damages, and they wouldn't even let the Bastas on their property to put plantings in. So legally, there's no basis for damages in that regard. The last two things that are not supportable here are issues of fact. The date of completion. Judge Mangieri didn't find substantial completion. He said that based on the evidence, there was completion by a specific date. That's the date in Mrs. Zagardo's photograph. That photograph shows, and you'll find the findings in detail in Judge Mangieri's order, when the forms were off, the wall was standing, it was structurally complete. There were some other things that got done later, but that is a fact finding of the trial judge of the date of completion. It's not against the manifest weight of the evidence. It's discussed at some length in our brief. The last disputed issue of fact is whether there was any intentional action on behalf of anyone. There's no finding by the trial court of any intentional action on behalf of O'Krum. But as to the Bastas, the judge's finding specifically, and this is A-15 of the record, though perhaps not intentionally, yes, the Bastas or their designees misled Russell, who was the O'Krum property inspector, as to the scope and dimension of this proposed wall. I would submit to you that a fair reading of that is to take a line from an old comedy routine. What we have here is a failure to communicate. It's sad. It's led to a lot of difficulty for all the parties here. With all due respect, any one of those arguments would defeat the Zagato's appeal. Taken together, the trial court should be affirmed. Was there a subsequent approval of the retaining wall? No. In November? There was not. What happened was there was a meeting of the AEC committee where they decided essentially that the bird had flown, and so they weren't going to go after it, if you will, and then that in turn led to the meetings that led to the filing of the suit. Did they ever approve the construction of that wall retrospectively or not? Because in my brain I'm thinking harmless error. If there wasn't a permit applied for but the wall would have been approved, there's kind of a harmless error. My reading, you'll find if you get into the evidence, and if you get into the weeds, you'll find a lot of things. There was somebody from that committee who testified. The bottom line is no one knows how they would have voted on the committee because by the time it came to them, the deed was done. The wall was complete. Thank you. Thank you, Mr. Robertson. And Ms. Nelson. Good afternoon, Your Honors. I'm Elisa Nelson. I represent Ray and Chris Foster in this appeal as well as KB Farms of Montana LLC, which is the actual record owner of Lot 392 at Forest Ridge, but Ray and Chris Foster are the owners of that LLC. Your Honors, the trial court did not abuse its discretion in finding that the retaining wall had been completed prior to any party filing suit. As Mr. Robertson has stated to you, I think the record is replete with the evidence that the wall was completed at the time that Ms. Zagardo took the photograph and discovered that she had this problem with the retaining wall itself. The judge in the trial court order goes on to state that the forms had been removed, everything, all but basically some backfilling and landscaping needed to be done, thus finding that it was complete at that time. However, in any event, it was absolutely completed by the December 3, 2015, date that this complaint was filed by the Oak Run Property Owners Association. Was there anything prohibiting the Zagardos from filing suit for declaratory action the day after they saw this? Absolutely not, Your Honor. That is one of the major issues here is that the Zagardos seem to be relying upon Oak Run to act on its behalf and do something about this wall. The thing here is that Oak Run doesn't have to do that. They cannot be forced to enforce their own covenants, for lack of a better way to phrase that. The Zagardos, in their own brief, state that anybody can file suit to enforce these covenants. They just didn't do it. So let's assume we have two dates at issue, that the wall looked one way in October. Yes. Then after the photograph was taken, some work continued. By December, that work was done. What prohibited the Zagardos from initiating the lawsuit within that 6-week window or 8-week window? Because stopping the work by filing a lawsuit, anyway, can you respond to that one? Was there something prohibiting them? No, Your Honor. There was nothing that would prohibit the Zagardos from filing the suit on their own, through an attorney, in any way, shape, or form. They seem to argue that Oak Run did nothing, and Oak Run should be held liable for that, when, in fact, the Zagardos did have the ability to file that suit themselves. No temporary restraining order to stop the progression? Nothing like that was done? Nothing like that was done at all, Your Honor. The bosses also contend that the trial court did properly deny the injunctive relief. I believe that the trial court did not find that there was any intentional misleading, and I believe Mr. Robertson stated it exactly correctly, that it was just a massive failure to communicate in this case. The injunctive relief, I believe, fails at step one, in this case, for the Zagardos. I do not believe that the Zagardos had any clear or ascertainable right to be protected in this case. They are asking the court to order a permanent injunction that the Bastas or Oak Run remove this wall, simply because Ms. Zagardo is not a big fan of how it looks. It's not on her property, and she has no ascertainable property right in that particular avenue. She or they do not have anything in need of protection in this case, but to play devil's advocate, let's assume they did have something in need of protection. They are not suffering any irreparable harm here. They absolutely have an adequate remedy at law. Which is what? Your Honor, they could have specifically proven monetary damages. As Mr. Robertson said, the appraisers in the case did testify. I believe Ms. Dagan testified that the value might have lowered by $10,250, and Mr. Daley testified that it was $10,000. They may have that switched, but – to the Zagardo's home might have been, because there's a substantial change in the appearance of the wall. Yes, Your Honor. I believe both appraisers testified that that landscaping would remedy any diminished value in the Zagardo's property whatsoever, and that the other issue there is that Ms. Zagardo let her yard kind of go to the weeds, so any additional diminished value by that is on her. She clearly testified at trial that she did not believe that she was part of the solution, and she did not participate in any way in mitigating any of these issues. She wouldn't allow the Bostas or their contractors on their land in order to landscape. However, even with that – Was the landscaping remedy to be built, structured, whatever on the Zagardo's lot? The landscaping contemplated was always going to be on the Bostas' lot, correct? That's correct. The landscaping was always going to be on the Bostas' lot. However, some of the testimony supported that the Bostas had approached Ms. Zagardo about landscaping through their lot as well, but either way, it was done on the Bostas' lot. I believe there was two-foot clearance between the wall and the property line. The court is arguing at this point in time that the Bostas are required to finish $10,000 worth of landscaping on the Zagardo's land, you know, putting trees up or something to – all right. No, Your Honor. I think the trial court specifically found that any damages at law that could have been had were remediated by the Bostas in doing this landscaping. Your Honor, we would simply conclude by saying that the trial court in this case did not abuse its discretion in finding the date of completion, and the trial court did not abuse its discretion in failing to grant that permanent injunction for any of the reasons stated in the appellant's brief. Thank you. Maybe I'm not understanding Article VI too well, but it seems that if you and I are adjacent landowners, I can go do anything without getting a prior approval from the architectural committee. Is that what it's called, or what is it? Yes, the AEC committee, the architectural and environmental, I believe. As long as I get it done quickly. That might be a bit of a slippery slope. Is it? It can be, yes. I think that it encourages the permit, and I think the situation we have here is that the contractors believed, based on their conversations with Dan Russell, that they did have permission to construct that wall. Well, that isn't the issue, is it? What the contractors believe or don't believe. No, but I think it does go directly to... I mean, we're talking homeowners. These covenants are supposedly covering the homeowners. We don't think about the contractors in these covenants. Right, I believe the contractors are an extension of the homeowner. That's why I think you have to use that as the contractors, and the homeowners equally are responsible for what each other is doing. Well, apparently in this article, the way it's written, there's an obligation by a homeowner if he or she is going to modify the property to seek approval from this architectural committee, am I correct? That's correct. And so in this case, the Bostas did not do that, is that correct? I don't think that is correct. I think they sought the initial permit. I believe after that there was a verbal conversation, is what the trial record would be, between... Okay, so there wasn't a seeking of permit. There were the initial permits, yes, Your Honor.  I believe the AEC committee issues the permits. So the committee was on notice that there was going to be some improvement, modification, or change in the Bostas property? Yes, Your Honor. Okay. But is the issuance of the permit approval of the design and location? Yes, and then if a change to that is going to happen, I believe the covenant requires that the committee be updated on that change and they have the opportunity to approve or deny that. However, I also believe that it's been the practice at Oak Run that Dan Russell, the agent for the AEC committee, has been in the business of approving minor changes. So he's the czar of the architecture? Kind of, yes. Okay. But there were permits issued? Yes, there were initial permits issued, absolutely. Before any construction occurred? Yes. And what's the permit look like? What does it include? What's the description? I believe the permit includes kind of the description of what's going to happen and drawings about what they are. Then the permit is issued from Oak Run to the property owner. Is there any notice to an adjacent property owner that there's been a seeking of a permit and an issuance thereof? I don't believe so, other than possibly in the publication of the agendas for those particular AEC meetings. Which are circulated or are considered notice to all property owners? Unfortunately, Your Honor, I'm not quite sure the answer to that on how Oak Run does circulate those agendas. Thank you. Thank you. Thank you, Ms. Nelson. And Mr. Blake? Thank you, Your Honor. I'm here today not to argument. I'm here just simply because of the fact, as my brief had indicated, that all issues pertaining to the sanitary district had been waived. But I wanted to be here in court today. I missed the note that says no arguments. Thank you, Your Honor. Nice to see you. Thank you. Mr. Skinner, any rebuttal? Very briefly. Going back quickly to the issue of this permit, there was a landscaping application for extensive landscaping. It's in your materials. The trial court found specifically, though, that they did not, they being the bosses, did not comply with the rules regarding this wall when providing that permit and that the permit that was approved ultimately by the AEC did not cover this wall because it was way beyond the scope of what was in the permit that was actually sought. So I just want to be clear about that. While the permit, it was a landscaping permit approved, but it did not in any way. And you can see it. Do you agree with the trial court's findings? Because I'll read the language. It says this is a landscaping permit, and it's on C-55 of the record. It permits steps, patio, fireplace, retaining walls, and low-voltage landscape lighting. What is your position on what retaining walls was contemplated by that landscaping permit that was issued before the wall went up? I think it gets confusing because I believe there were two landscaping permits. One landscaping permit dealt with the backyard down by the lake, which has nothing to do with this appeal. And it had retaining walls down there. This one then did have, it just had, I mean, you're going to see what it shows. It has like a line saying retaining wall. I believe Mr. Russell and the Oak Run general manager testified that it's common for there to be small walls in these easements. I mean, two or three feet tall walls are common. This is a 10-foot tall wall that is not at all common. It's something that exceeds greatly the scope of what they provided. The other thing I didn't point out, and this is not really a huge issue, but the rules require that when you change the topography of the land, that you show that. Well, that permit, the original permit that has this drawn little line that says wall on it, it has topography, it has elevations on it. It doesn't show the elevations being changed. So the elevation is changed 10 or 11 feet, and it doesn't show any change in elevation. The topography of what, though? The lot. The lot. Yeah, the lot was, I mean, you see those, you can see. So how did it change the topography? Well, it raised the, within two feet of my client's house, it raised from what was a slope to 10 feet straight up, now a level yard. Okay, so there was, on the boss's side, there was backfilling the level yard. Yes, there was. So that's what it did. And so, and the elevations are on that. You can see them. I don't have them memorized, obviously. And the other small point I wanted to bring out is with regard to the standing of the Zagardos, the covenants, it's on EA, and it's cited to in my reply brief, clearly provide that each landowner in the Forest Ridge subdivision has the right to enforce the covenants and easements. It says that. It's directly stated in those covenants. And that is the protectable interest that you believe to transport and property of New Orleans? Yes. Thank you. Thank you, Mr. Senator. Thank you all. We're doing you a great favor. Bring your arguments today. We're going to take this matter under advisement. Get back to you with a written disposition within a short time.